☑ Original ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>The Cellular Device Assigned Call Number<br>(847) 641-6044 | )<br>)<br>)<br>)<br>)<br>) |

Case No. 24-811M(NJ)

Matter No. 2023R00438

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 3/20/2024 _____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.      ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Hon. Nancy Joseph _____ .
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☑ until, the facts justifying, the later specific date of _____ 09/01/2024 _____ .

Date and time issued: 3/6/2024 @ 4:23 p.m. _____

*Judge's signature*

City and state:   Milwaukee, WI _____

Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

# ATTACHMENT A

## Property to be Searched

1. Records and information associated with the cellular device assigned call number 847-641-6044 (referred to herein and in Attachment B as the "**Target Cell Phone**"), with an unknown listed subscriber, and used by Roberto Aviles-Rogel, that is in the custody or control of T-Mobile (referred to herein and in Attachment B as the "Service Provider"), a wireless communications service provider that is headquartered at 4 Sylvan Way, Parsippany NJ, 07054.

2. The Target Cell Phone.

1

## ATTACHMENT B

### Particular Things to Be Seized

Pursuant to an investigation of Roberto Aviles-Rogel (a.k.a. "Negro") for violations of 21 U.S.C. § 841(a)(1) (distribution and possession with the intent to distribute controlled substances), 846 (conspiracy to distribute and possess with the intent to distribute controlled substances), and 843(b) (illegal use of a communication facility), this Warrant authorizes the officers to whom it is directed to determine the location of the **Target Cell Phone** by collecting and examining the following:

### I.    Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a.    The following subscriber and historical information about the customers or subscribers associated with the Target Cell Phone for the time period of February 1, 2024, to the present:

i.    Names (including subscriber names, usernames, and screen names);

ii.    Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

iii.    Local and long-distance telephone connection records;

iv.    Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v.    Length of service (including start date) and types of service utilized;

2

vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records, and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phone for the time period February 1, 2024, to the present including:

a. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

b. information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT, Timing Advance, LOCDBOR, or equivalent).

b. Information associated with each communication to and from the Target Cell Phone for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e., antenna towers covering specific geographic areas) and sectors (i.e., faces of the towers) to which the Target Cell Phone will connect at the beginning and end of each communication, as well as timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT, Timing Advance, LOCDBOR, or equivalent).

3

c. Information about the location of the Target Cell Phone for a period of 30 days during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

    i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

    ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. See 18 U.S.C. § 3103a(b)(2).

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 21 U.S.C. § 841(a)(1) (distribution and possession with the intent to distribute controlled substances), 846 (conspiracy to distribute and possess with the intent to distribute controlled substances), and 843(b) (illegal use of a communication facility), involving Roberto Aviles-Rogel (a.k.a. "Negro") and others known and unknown.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

4

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>The Cellular Device Assigned Call Number<br>(847) 641-6044 | )<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 24-811M(NJ)<br><br>Matter No. 2023R00438 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1); 846;<br>and 843(b) | Distribution and possession with the intent to distribute controlled substances;<br>conspiracy to distribute and possess with the intent to distribute controlled<br>substances; and illegal use of a communication facility. |

The application is based on these facts:

See Attached Affidavit.

- ☑ Continued on the attached sheet.
- ☑ Delayed notice of __180__ days *(give exact ending date if more than 30 days:* 09/01/2024 *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Andrew Langer, FBI TFO
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means)*.

Date: 3/6/2024

City and state: Milwaukee, WI

_____
Judge's signature

Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Task Force Officer Andrew Langer, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND BACKGROUND

1. I make this affidavit in support of an application for a second extension of a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number **847-641-6044** ("**Target Cell Phone**"), known to be used by Roberto Aviles-Rogel ("Aviles-Rogel") aka "Negro" and whose service provider is T-Mobile, a wireless telephone service provider ("Service Provider") headquartered at 4 Sylvan Way, Parsippany NJ, 07054. The **Target Cell Phone** is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

3. I have been employed with the Milwaukee Police Department as a full time sworn police officer for eight years. I am currently assigned as a task force officer (TFO) with the Milwaukee Area Safe Streets Task Force (MASSTF) and the Federal Bureau of Investigation (FBI) Milwaukee Field Office. In August 2023, I was officially sworn in as a federal task force officer

to work with MASSTF, which provides me with the authorization to present sworn affidavits in support of federal search warrant applications. I have received training and have experience in the area of controlled substances investigations, money laundering, financial investigations, and various methods that drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of controlled substances laws to include other violations associated with the trafficking of controlled substance. I have participated in numerous drug investigations utilizing various means of investigation including but not limited to, the execution of search warrants, the use of subpoenas, the use of informants, and the use of GPS and other location data.

4.      As a federal task force officer and local police officer, I have participated in the investigation of narcotics-related offenses resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, weapons, stolen property, millions of dollars in United States currency and other evidence of criminal activity. As a narcotics investigator, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by the traffickers and abusers of controlled substances. I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover transactions, analysis of phone and financial records, and arrests of numerous drug traffickers. I have been the affiant on many search warrants. I have also spoken on numerous occasions with other experienced narcotics investigators concerning the methods and practices of drug traffickers and money launderers. Furthermore, I have attended training courses

3

which specialized in the investigation of narcotics trafficking and money laundering. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods used by drug traffickers to manufacture, smuggle, safeguard, and distribute narcotics, and to collect and launder trafficking-derived proceeds. I am further aware of the methods employed by major narcotics organizations to thwart any investigation of their illegal activities.

5. The facts in this affidavit come from my personal observations, my training and experience and information obtained from other agents and witnesses. The information is based, in part, upon my training and experience, as well as information provided to me by another agent with specialized training in cell phone tracking, cell towers, etc. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

7. Based on the facts set forth in this affidavit, there is probable cause to believe that (1) violations of 21 U.S.C. § 841(a)(1) (distribution and possession with the intent to distribute controlled substances), 846 (conspiracy to distribute and possess with the intent to distribute controlled substances), and 843(b) (illegal use of a communication facility) have been committed, are being committed, and will be committed by Aviles-Rogel; (2) the location information described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of other individuals who are engaged in the commission of these offenses with

4

Aviles-Rogel. Aviles-Rogel is using the **Target Cell Phone,** and the listed subscriber is unknown; and (3) the location of the **Target Cell Phone** will assist law enforcement in obtaining the **Target Cell Phone**, which contains evidence of those criminal violations. I know from training and experience that cell phone users normally have their cell phones with them, so locating a user's cell phone will show that user's location. I believe that locating the **Target Cell Phone** will constitute and lead to evidence of the federal offenses listed above.

8. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offenses being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

<u>**PROBABLE CAUSE**</u>

9. I am currently working with a Confidential Human Source (CHS), who I believe is reliable and credible. Since approximately July 2022, the CHS has provided information to law enforcement officers concerning criminal activity in the Milwaukee, WI area. The CHS' information has been accurate and corroborated, in part, by: (a) my knowledge of violent gang members in the Milwaukee, WI area; (b) intelligence gathered from other Milwaukee gang investigations through controlled narcotics purchases and consensually recorded phone calls; (c) independent investigation including surveillance; and (d) information from other confidential sources. The CHS is cooperating with case agents for monetary compensation. CHS is a convicted felon with prior convictions for Burglary, Operating a Motor Vehicle Without Owner's Consent, Battery, and Possession with Intent to Deliver Narcotics. As detailed below, the CHS has conducted at least four controlled buys of cocaine on behalf of case agents. After the first

5

controlled buy, I met with the CHS and the CHS made statements about what occurred during the buy. I then reviewed audio/video footage made by the CHS of the transaction and found that it was consistent with the CHS' statement. The recording device for the second controlled buy did not record and, therefore, I was unable to review it to compare with the information provided by the CHS. However, surveillance observations by case agents during the second controlled buy were consistent with the information provided by the CHS. I have reviewed recordings made by the CHS of the third controlled buy detailed below and they are consistent with the information provided by the CHS as to what occurred. For these reasons, I believe the CHS is credible and reliable.

10. In the beginning of 2023, Milwaukee Police Officer Justin TORRES and I were approached by the CHS regarding large-scale narcotics trafficking from 2000 W. Mitchell Street, Milwaukee, Wisconsin. This location includes an attached upper, residential unit (1673 S. 20th Street #Upper) and a tavern on the ground floor called the El Infierno Bar. The CHS stated that the CHS has witnessed multiple kilo-level drug transactions at 2000 W. Mitchell Street and 1673 S. 20th Street #Upper involving two different narcotics traffickers (known to the CHS by the nicknames "Negro" and "Cuba). In March 2023, the CHS physically identified "Negro's" vehicle to me. The CHS pointed at a blue, Chevrolet Silverado pick-up truck bearing Wisconsin License Plate #TA6987 (subject vehicle) that was parked in the area of 2000 W. Mitchell Street.

11. I conducted a records search through the Wisconsin Department of Transportation (WI DOT) for the 2004, blue, Chevrolet, Silverado, Wisconsin license plate TA6987 which revealed that the vehicle's vehicle identification number (VIN) is 2GCEC19T241356489 and the

6

vehicle lists to an adult female with the initials S.R. I have not located any connection between S.R. and the target beyond his use of a vehicle registered to S.R.

## CONTROLLED BUYS

12. Based on my training and experience, I know that a "controlled buy" is a law enforcement operation in which an informant, such as the CHS, purchases drugs from a target at the direction of law enforcement. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When a CHS is used, s/he is searched for contraband, weapons, and money before the operation. The CHS is also wired with a concealed body recorder and/or a monitoring device. When the transaction is completed, the CHS meets cases agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The CHS is again searched for contraband, weapons, and money and then interviewed by the case agents about the drug transaction. A sample of the suspected drugs is then field tested by the case agents for the presumptive presence of controlled substances and then placed in inventory pursuant to normal inventory procedures. Often, the calls to the target by the CHS are consensually recorded calls under the direction and control of case agents and/or made in the presence of case agents.

### Controlled Buy #1

13. In early-November 2023, I arranged for the CHS to conduct a controlled buy of cocaine from "Negro." In my presence, the CHS called "Negro's" cellular phone number which I observed to be **847-641-6044** (**Target Cell Phone**). I listened to the CHS' conversation with "Negro." From the content of their conversation, the overall context, and my training and experience, it is clear to me that the CHS ordered a quantity of cocaine from "Negro" during this

7

call. Further, "Negro" instructed the CHS to meet with him at his truck parked in the rear of his apartment (which the CHS knew to be located at 2000 W. Mitchell Street.) During the call, the CHS confirmed the price per ounce with "Negro." TFO Kyle Veloz and I drove the CHS to 2000 W. Mitchell Street and observed the blue, 2004 Chevrolet Silverado pick-up truck bearing a Wisconsin registration TA6987 (the subject vehicle) parked at that address. The CHS pointed at the subject vehicle and indicated that it is "Negro's" vehicle and is the only vehicle the CHS has ever observed "Negro" drive over the past three years.

14. I searched the CHS and did not locate any contraband, money, or weapons. I gave the CHS a quantity of pre-recorded buy money and recording equipment. I dropped the CHS off north of W. Mitchell Street. I observed the CHS walk toward the subject vehicle. I observed the CHS enter the subject vehicle and then exit moments later. I then picked the CHS up and debriefed the CHS about what occurred in the subject vehicle. The CHS indicated that "Negro" took the cash and instructed the CHS to come back in approximately 15 minutes to pick up. Case agents kept the CHS under constant visual surveillance from that time that the CHS was dropped off near W. Mitchell Street until I picked the CHS up. The CHS made no stops and interacted with no one other than the occupant of the subject vehicle. I conducted another search of the CHS and did not locate any contraband, money, or weapons including the pre-recorded buy money.

15. The CHS told me that: while in the subject vehicle, "Negro" and the CHS discussed how much "Negro" is charging the CHS. "Negro" confirmed how much the CHS would receive for money given to "Negro." The CHS gave the pre-recorded buy money to "Negro." "Negro" instructed the CHS to come back in approximately 15 minutes. I later reviewed audio/video

8

footage made by the CHS of this interaction with "Negro" and found it to be consistent with the CHS' statement.

16.     I waited with the CHS to receive the phone call from "Negro" telling the CHS that the cocaine was ready to pick up. After less than an hour, the CHS received a cellular phone call from **847-641-6044** (**Target Cell Phone**) in my presence and was instructed by "Negro" to come pick up. I dropped the CHS off at the same location near W. Mitchell Street and watched the CHS walk to the to the parking slab behind 2000 W. Mitchell Street. I observed the CHS enter the front passenger seat of the subject vehicle. Moments later, I observed the CHS exit the front passenger seat of the subject vehicle and walk northbound. I picked the CHS up and the CHS immediately gave TFO Veloz a bag containing a white brick-like substance that I suspected to be cocaine base. The CHS advised that "Negro" told the CHS that "Negro" was short right now and needed to pick up another load of narcotics. The CHS was told that "Negro" would get the rest at a later time. The CHS stated "Negro" indicated that the other guy (believed by case agents to be "Negro's" supplier) has to go to get the other brick and cut it. "Negro" stated he only has the amount that he has right now until the guy picks up the other brick. "Negro" stated he is going to receive a call and he will call the CHS. I later reviewed audio/video footage made by the CHS of this interaction with "Negro" and found it to be consistent with the CHS' statement.

17.     I conducted a final search of the CHS and did not discover any contraband, money, or weapons. Case agents kept the CHS under constant visual surveillance from that time that the CHS was dropped off near W. Mitchell Street until I picked the CHS up. The CHS made no stops and interacted with no one other than the occupant of the subject vehicle.

9

18. I transported the suspected cocaine base to the Milwaukee Police Department District Two for testing. I observed it to be a white, hard, brick-like substance. I tested the suspected cocaine base using the Nark II Field Test Kit, Pouches #07 and #33. These are presumptive field tests that I am trained to administer and which test for the presence of cocaine and fentanyl, respectively. The substance field tested positive for cocaine base and fentanyl. The total weight of the cocaine base / fentanyl was over 100 grams.

19. At the time of Controlled Buy #1, I did not yet know "Negro's" identity and knew him only by his nickname. In late November 2023, I conducted a traffic stop of a vehicle operated by "Negro" and was able to identify him as Roberto Aviles-Rogel. Based upon surveillance, I was able to determine that Aviles-Rogel now resides at 2218 S. 21st Street, Milwaukee, Wisconsin.

**Controlled Buy #2**

20. In early December 2023, I met with the CHS regarding a controlled buy of cocaine from Aviles-Rogel aka "Negro." The CHS was going to attempt to purchase a quantity of cocaine from Aviles-Rogel. The CHS communicated with Aviles-Rogel via telephone at the phone number of 847-641-6044 ("Target Cell Phone"), which was witnessed by a Milwaukee Police Department (MPD) undercover officer ("undercover officer"). While in phone contact with the user of (847) 641-6044, the CHS arranged for the CHS and the undercover officer to meet with Aviles-Rogel to conduct the cocaine purchase using an FBI undercover vehicle.

21. The undercover officer conducting the controlled buy with the CHS conducted an initial search of the CHS and did not discover any contraband, money, or weapons. Case agents kept the undercover officer and the CHS under constant visual surveillance from that time that the CHS left the pre-determined location until they reached the location within the Eastern District of

10

Wisconsin where the CHS and the undercover officer were to meet with Aviles-Rogel. The CHS made no stops and interacted with no one.

22.     In the presence of the undercover officer, the CHS placed a phone call to Aviles-Rogel at 847-641-6044 ("Target Cell Phone") to discuss the purchase of cocaine. Case agents on surveillance were positioned around Aviles-Rogel's residence located at 2218 S. 21st Street, Milwaukee, Wisconsin.

23.     While on surveillance, case agents observed Aviles-Rogel exit his residence and enter the driver seat of a black Chevrolet Silverado (WI UF3579) and leave the area southbound on S. 21st Street.

24.     Case agents conducted mobile surveillance of Aviles-Rogel in the black Silverado until he arrived at El Infierno Bar, located at 2000 W. Mitchell Street. While parked outside the bar, case agents observed Aviles-Rogel meet with an unknown individual. After a brief interaction, case agents observed Aviles-Rogel leave the location in the black Silverado.

25.     Case agents conducted mobile surveillance of Aviles-Rogel until he reached the pre-determined meet location (located within Milwaukee County). Case agents already on surveillance at the pre-determined meet location observed the CHS enter the front passenger seat of the black Silverado operated by Aviles-Rogel. Case agents then observed the CHS exit the black Silverado and return to the undercover vehicle where the undercover officer was located. According to the undercover officer, the CHS stated that the CHS provided the buy money to "Negro" while inside the black Silverado.  Case agents and the undercover officer observed that Aviles-Rogel was the sole occupant of the black Silverado at the time that the CHS was inside the vehicle.

11

26.     Case agents followed Aviles-Rogel in the black Silverado from the meet location and briefly lost sight of his vehicle. A short time later, case agents observed Aviles-Rogel park the black Silverado at the El Infierno Bar. Aviles-Rogel exited the black Silverado and entered the bar.

27.     TFO Klarkowski later reviewed pole camera footage that depicted the exterior of the residence at 921 W. Walker Street, Milwaukee, Wisconsin, which I know through my investigation to a residence belonging to a potential cocaine source of supply. TFO Klarkowski observed Victoriano Botello Jr. ("V. Botello") arrive at the residence and enter the front door during the timeframe just prior to this controlled buy. TFO Klarkowski was able to observe that V. Botello was not carrying anything in his hands when he entered the residence.

28.     On the pole camera footage, TFO Klarkowski later observed V. Botello exit the residence approximately 11 minutes later, carrying a white plastic shopping bag in his right hand. Case agents on surveillance outside of El Infierno Bar observed V. Botello arrive operating his black GMC Yukon (WI ASL-3439) wearing the same clothing as depicted on the pole camera footage. Case agents observed V. Botello enter the front door of the bar carrying what appeared to be the same white plastic shopping bag. Based on prior surveillance, case agents were aware that Aviles-Rogel was inside of the bar at the time that V. Botello entered with the white plastic bag.

29.     Shortly thereafter, case agents observed V. Botello exit the bar with no bag in his hands. Within minutes of V. Botello exiting/leaving the bar, case agents observed Aviles-Rogel exit the bar and appeared to be clutching something underneath or inside of his hooded sweatshirt. Case agents observed Aviles-Rogel re-enter the black Silverado and drive away.

12

30.     Surveillance attempted to follow Aviles-Rogel back to the pre-determined meet location where Aviles-Rogel was supposed to meet with the undercover officer and the CHS. Case agents briefly lost visual of Aviles-Rogel's vehicle, but quickly regained surveillance. Case agents then observed Aviles-Rogel parking the black Silverado next to the undercover vehicle operated by the undercover officer and the CHS. From the time that the CHS left Aviles-Rogel's black Silverado until the time that Aviles-Rogel returned to the meet location, the CHS was in the presence of the undercover officer and did not meet with anyone else.

31.     Case agents then observed the CHS exit the undercover vehicle and enter the front passenger seat of the black Silverado operated by Aviles-Rogel. Case agents observed the CHS remain inside the black Silverado for a short time and then return to the undercover vehicle operated by the undercover officer. The undercover officer advised TFO Klarkowski that once inside the undercover vehicle, the CHS provided the undercover with a quantity of cocaine inside of a white plastic bag. TFO Klarkowski later viewed this bag, and it is consistent with the bag TFO Klarkowski observed V. Botello obtain from the 921 W. Walker Street residence on the pole camera video and carry into the bar.

32.     The undercover officer conducted a final search of the CHS and did not discover any contraband, money, or weapons. Case agents kept the CHS under constant visual surveillance from the time that the CHS left the undercover vehicle until the CHS returned to the undercover vehicle. The CHS made no stops and interacted with no one other than the occupant of the black Silverado. Case agents and the undercover officer observed that Aviles-Rogel was the sole occupant of the black Silverado at the time that the CHS was inside the vehicle.

13

33. FBI Special Agent David Shamsi transported the suspected cocaine to the FBI Milwaukee Field Office for testing. While at the FBI, TFO Larrel Lirette later subjected a sample of the suspected cocaine to a TruNark presumptive field test, which yielded positive results for cocaine HCI. The weight of the cocaine is consistent with an amount intended for resale and not for personal use based upon my training and experience in drug investigations.

34. The undercover officer and I debriefed the CHS concerning the purchase of cocaine. The CHS advised that after getting into the black Silverado, the CHS acquired the cocaine from "Negro" (known to case agents to be Aviles-Rogel). The recording equipment the CHS possessed at the time of this transaction did not function properly, so case agents were unable to review it to corroborate what the CHS stated. However, the undercover officer was located nearby and observed the CHS exit the undercover vehicle, walk directly to the black Silverado that case agents observed Aviles-Rogel to be operating moments earlier, and then walk directly back to the undercover vehicle in possession of the cocaine.

35. After V. Botello and Aviles-Rogel left the bar, TFO Klarkowski observed pole camera video of V. Botello arriving back at the 921 W. Walker Street residence approximately 10 minutes later and remaining inside for approximately five minutes. Based upon this investigation, case agents believe that 921 W. Walker Street is a residence associated with V. Botello's brother, Cain Botello Sr. Botello Sr. was not in the Milwaukee area at the time of Controlled Buy #2.

36. Based on my training and experience, along with the observations made during this operation, I believe that Victoriano Botello retrieved the cocaine from the 921 W. Walker Street residence, transported it in the white plastic bag to the bar, where he met with Aviles-Rogel. I believe that V. Botello provided the cocaine to Aviles-Rogel in the white plastic bag in exchange

14

for the buy money that the CHS had provided to Aviles-Rogel moments earlier. I believe that V. Botello then delivered the buy money to the 921 W. Walker Street residence and Aviles-Rogel met with the CHS to provide the cocaine that Aviles-Rogel just acquired from V. Botello.

37. I am also aware that another Botello DTO member, Marco Medel ("Medel") was in contact with V. Botello and Aviles-Rogel's phones during the December controlled buy detailed above (Controlled Buy #2). Medel is a street level cocaine trafficker selling narcotics on behalf of the Botello DTO. Case agents later reviewed court ordered phone records for Aviles-Rogel's phone (Target Cell Phone) and V. Botello's phone. Upon reviewing records from Aviles-Rogel's phone, case agents observed that Aviles-Rogel's phone (Target Cell Phone) was in contact with phone number 414-499-6919 (Medel) fairly regularly. Utilizing law enforcement databases, I learned that this number belonged to Medel. An administrative subpoena served for 414-499-6919 revealed that Marco Medel is the listed subscriber. Case agents have observed Medel at El Infierno Bar on multiple occasions over the last several months. I reviewed phone records for Aviles-Rogel's phone (Target Cell Phone), and V. Botello and Medel's phones for the date of the above-described controlled buy (Controlled Buy #2). Said records showed that the CHS contacted Aviles-Rogel's phone number 847-641-6044 (Target Cell Phone). Aviles-Rogel's number called the CHS back (ostensibly to discuss the drug transaction). Within 30 minutes of the call between the CHS and Aviles-Rogel's phone, Aviles-Rogel's phone called Medel's phone number of 414-499-6919. Within 5 minutes after the last call between Aviles-Rogel and Medel's phones, Medel's phone called Victoriano Botello's phone at 414-399-7825. Shortly thereafter, as detailed above, Aviles-Rogel met with the CHS and the CHS provided Aviles-Rogel with the buy money. Aviles-Rogel did not yet have the cocaine. Minutes later, Medel's phone number called Aviles-Rogel's

15

phone number (Target Cell Phone) twice and Medel was observed by case agents at El Infierno Bar. V. Botello was observed arriving at the bar, and Aviles-Rogel was later observed exiting the bar, and ultimately met with the CHS to deliver the cocaine as detailed above. Case agents believe that Aviles-Rogel contacted Medel to obtain the cocaine ordered by the CHS, then Medel immediately contacted Victoriano Botello, who acquired the cocaine from Botello Sr.'s residence.

**Controlled Buy #3**

38.     Case agents instructed the CHS to make contact with Aviles-Rogel and start discussing the specifics of another cocaine purchase.  The CHS told TFO Langer that the CHS has been in communication with Aviles-Rogel via 847-641-6044 (**Target Cell Phone**) to discuss the logistics of another cocaine deal.  TFO Langer reviewed the court ordered phone results provided by T-Mobile for 847-641-6044 (**Target Cell Phone**), which confirmed that the phone number case agents know to be used by the CHS and Aviles-Rogel's number (**Target Cell Phone**) have been in contact during the relevant timeframe.  The CHS told TFO Langer that the CHS has observed Aviles-Rogel at the El Infierno Bar on at least 10 occasions since mid-December 2023. Furthermore, TFO Langer has observed Aviles-Rogel at the El Infierno Bar as recently as January 7, 2024.

39.     In January 2024, I met with the CHS regarding a controlled buy of cocaine from Aviles-Rogel aka "Negro." The CHS communicated with Aviles-Rogel via telephone at the phone number of 847-641-6044 ("Target Cell Phone"), which was recorded by case agents, to discuss costs and they agreed to meet at El Infierno Bar. The conversation at the bar was not recorded but the CHS told me that the CHS met with Aviles-Rogel and arranged to purchase a quantity of cocaine.  On a later date, in my presence, the CHS contacted 847-641-6044 ("Target Cell Phone")

16

and arranged to meet Aviles-Rogel at a location within the City of Milwaukee. The CHS and Aviles-Rogel (using 847-641-6044 ("Target Cell Phone")) had additional voice and text communications, which were witnessed by me. Later, prior to the controlled buy, I searched the CHS and the CHS's vehicle for contraband with negative results. The CHS was then kept under constant surveillance until the CHS arrived at the pre-determined meet location. Case agents observed Aviles-Rogel leave his residence at 2218 S. 21st Street and travel directly to the CHS' location, where TFO Boyd observed Aviles-Rogel meet with the CHS. Case agents were aware that this meeting would likely be when the CHS would provide Aviles-Rogel with prerecorded buy money and that it was likely that Aviles-Rogel would need to travel elsewhere to obtain the cocaine.

40.     Case agents then followed Aviles-Rogel back to his residence, where he remained for a short time, before leaving again and returning to the CHS' location in possession of a backpack. TFO Boyd witnessed Aviles-Rogel meet with the CHS and then depart the area. The CHS then returned to me and turned over a quantity of suspected cocaine. I searched the CHS and the CHS's vehicle for contraband with negative results. From the time that I initially searched the CHS until the CHS later returned to me with the cocaine, the CHS was kept under constant surveillance and did not meet with anyone other than Aviles-Rogel.

41.     The suspected cocaine was turned over to TFO Brian Ploch. TFO Brian Ploch tested the cocaine utilizing TruNarc and received a positive reaction for the probable presence of cocaine. TFO Ploch weighed the cocaine which totaled over 100 grams. A preliminary review of Aviles-Rogel's phone contacts did not show any contact with V. Botello or Medel in the time frame around controlled buy #3. Although Aviles-Rogel's phone was not in direct contact with Medel's phone

17

during controlled buy #3 (as he was during the previous buy), both Medel and Aviles-Rogel's phones were both in contact with (414) 319-9973 during controlled buy #3. More specifically, Aviles-Rogel's phone (Target Cell Phone) was in contact with this number during a timeframe that overlapped with the timeframe that Medel's phone was in contact with that number. Case agents have identified (414)319-9973 as belonging to Jayme Congleton aka "Jamo" who case agents believe to be associated with the Botello DTO. This number was identified as belonging to Jayme Congleton by TFO Klarkowski who utilized two separate reliable law enforcement databases. The CHS also told TFO Langer that Jayme Congleton was one of the drug dealers operating out of El Infierno Bar. Additionally, TFO Ploch reviewed pen register/trap and trace data for V. Botello's phone and knows that V. Botello's phone is also in contact with Jayme Congleton's phone. V. Botello and Congleton's phones were in contact as recently as January 6, 2024. Finally, TFO Langer spoke to MPD-VCRT Officer Torres who is familiar with this investigation. Officer Torres has observed Jayme Congleton and his vehicle at El Infierno during prior surveillance.

### Controlled Buy #4

42. At the end of February 2024, I met with the same CHS as controlled buy of cocaine #1 for the purposes of conducting a controlled evidence purchase of cocaine from Aviles-Rogel. I met with the CHS and searched the CHS for money and/or contraband finding none. I instructed the CHS to call Aviles-Rogel "Negro" at 847-641-6044 (Target Cell Phone) and order an amount of cocaine. The call was conducted in my presence and recorded. The following is a summary of the conversation between the CHS and Aviles-Rogel.

**Aviles-Rogel:** What happened.

**CHS:** Comments that Aviles-Rogel helped him out. CHS says he has 65 and needs the battery for the car. CHS states that Aviles-Rogel told CHS that he could get batteries really

18

cheap at AutoZone from that woman that works there. CHS mentions that he has 65 bucks and asks if Aviles-Rogel can help CHS out.

**Aviles-Rogel:** affirms.

***Aviles-Rogel and CHS continued to discuss when and where to meet. ***

43.     I know from a conversation with CHS that "batteries" are code utilized to discuss cocaine. I believe this conversation reflects CHS having an initial conversation with Aviles-Rogel to explore the purchase of cocaine.

44.     Physical surveillance was established on Aviles-Rogel.  Later in the day the CHS received a text message which stated, "5 minute be there".  I met with the CHS and searched the CHS for money and contraband finding none and provided the CHS with pre-recorded buy money. I followed the CHS to the pre-determined meet location. The CHS did not make any stops prior to meeting with Aviles-Rogel. Physical surveillance followed Aviles-Rogel who arrived at the pre-determined meet location shortly before the CHS. Upon the CHS arriving, case agents observed the CHS enter Aviles-Rogel's vehicle. The CHS was equipped with an audio recording/transmitting device that was monitored by PO Torres, who is a Spanish speaking officer. The conversation inside of Aviles-Rogel's vehicle was recorded by the CHS with the CHS's consent. In summary, the CHS discussed with Aviles-Rogel how much cocaine Aviles-Rogel could give the CHS for the pre-recorded by money. The CHS was attempting to purchase around eight or nine ounces of cocaine.

45.     The below is a summary of the recorded in-person conversation between the CHS, Aviles-Rogel, and an Unknown Male [UM] who was observed by surveillance inside the vehicle with Aviles-Rogel prior to the meeting with the CHS.  This initial interaction reflects the CHS

19

ordering an amount of narcotics for a pre-recorded amount of money. This conversation was in Spanish and translated by PO Torres who is a Spanish speaking officer.

**CHS to Aviles-Rogel:** Open up the hood. Should we get inside the car, what you think? Should I sit in the back?

**\*\*\*Sounds like CHS gets into the car\*\*\***

**Aviles-Rogel to CHS:** How much?

**CHS to Aviles-Rogel:** 65

**CHS to UM:** Are you Puerto Rican?

**UM to CHS:** Ya

**CHS to UM:** It's the way you talk. You know one of my Cobra brothers, a younger boy? Are you a Cobra? I don't know about you young guys…you're not a Cobra right.

**UM to CHS:** No, but the Rodriguez, Jon Jon.

**CHS to UM:** I am going way back, I was Mediina's leader. I thought I seen you at…

**UM to CHS:** I don't go out like that.

**Aviles-Rogel to CHS:** It's cause I never told you what it is you wanted me to bring.

**CHS to Aviles-Rogel:** Nah man, I can't let you take the money, you need to give me the money and go get the shit. I can't let you take off like that. You know that man...the dope game is a vicious business. I can't just let you take the money man.

**Aviles-Rogel to CHS:** What do you want me to bring you?
**CHS to Aviles-Rogel:** Ah ya, I am not going to work with Pelon. I was talking with Pelon last night...[unintelligible] with that motherfucker. [unintelligible] spot. He a bum you know. You should give me a rebate, a perk, I be spending money bro, 6500 you can't bring be 9 ounces back?

**Aviles-Rogel to CHS:** You want ounces?

**CHS to Aviles-Rogel:** I need that cocaine bro.

**Aviles-Rogel to CHS:** I will bring it right now.

20

**CHS to Aviles-Rogel:** Let me get the money, I can't let you take the money. So where are we going to meet at, El Rey or something?

**UM to Aviles-Rogel:** Where are we going to meet each other?

**CHS to Aviles-Rogel and UM:** Give me the key to the car because I don't trust nobody. I gotta make a little bit as a mechanic. [Unintelligible from UM] you know what I mean man [unintelligible]. We have to blend in.

**UM to CHS:** I just got out. I am not trying to go back in.

**CHS to UM:** I was there for 10 years.

**CHS to UM:** This dude don't know the dope game.

**UM to CHS:** You probably know my family, Danny he is a barber.

**CHS to UM:** Ok Ok.

**Aviles-Rogel to CHS:** Give me 10 minutes.

**CHS to Aviles-Rogel:** At Home Depot or El Rey cause it's closer.

**UM to CHS:** See you later, nice meeting you.

**Aviles-Rogel to CHS:** 65?

**CHS to Aviles-Rogel:** At least 8, 9, let them know what's up.

**\*\*\* Car Started\*\*\***

46.     I know this conversation represents the CHS ordering cocaine from Aviles-Rogel. There was no exchange of money or narcotics during this interaction, but the CHS did show the pre-recorded buy money to Aviles-Rogel. I conducted a search of the CHS after this meeting and did not locate any other money, contraband, or weapons. The CHS was still in possession of the pre-recorded buy money. I instructed the CHS to drive to the second meeting location and wait for Aviles-Rogel to deliver the cocaine. PO Torres and I followed the CHS from the initial meeting location to the secondary meeting location. PO Torres and I did not lose sight

21

of the CHS the entire time. The CHS did not make any stops on the way to the second meeting location.

47. After the first meeting, case agents followed Aviles-Rogel directly back to his residence located at 2218 S. 21st Street, Milwaukee. Physical surveillance observed Aviles-Rogel in front of 2218 S. 21st Street talking on his cellular phone. Physical surveillance observed Aviles-Rogel stop talking on his cellular phone and immediately enter 2218 S. 21st Street. Physical surveillance observed Aviles-Rogel exit 2218 S. 21st Street moments later and begin to leave the area in the same vehicle he arrived in. Aviles-Rogel was alone when he left the residence. Physical surveillance followed Aviles-Rogel from 2218 S. 21st Street to the secondary meet location where the CHS was waiting to obtain the cocaine. Aviles-Rogel did not make any stops on his way to the secondary meeting location.

48. A short time after arriving at the second meeting location the CHS confirmed the secondary meeting location with Aviles-Rogel. A few moments later, Aviles-Rogel arrived at the second meeting location and got inside the CHS's vehicle.

49. The below is a summary of the recorded in-person conversation between the CHS and Aviles-Rogel at the second meeting location. This conversation was captured on the recording device possessed by the CHS and was done with the CHS's consent. This conversation was in Spanish and translated by PO Torres who is a Spanish speaking officer.

**Aviles-Rogel:** [says that CHS is nervous].

**CHS:** Nah, I am not nervous.

**Aviles-Rogel:** Nothing is going to happen.

**CHS:** I am not going to the bar.

22

**Aviles-Rogel:** You want to put it there?

**CHS:** Ya right there. Put the money [inaudible] in the glove compartment. They got cameras everywhere, if you leave right away…. your know I think both sides of the fence. I don't trust nobody bro. I got you bro, you hear me. I got that money.

**Aviles-Rogel:** Let me know.

50. After the second meeting, Aviles-Rogel was followed to 1439 S. Comstock Street, Milwaukee, Wisconsin, by case agents. I met with the CHS and the CHS indicated that the CHS gave the pre-recorded buy money to Aviles-Rogel in exchange for cocaine. The CHS turned over the cocaine to me. The CHS was kept under constant surveillance from the time the CHS met with Aviles-Rogel until the CHS met with me. The CHS did not interact with anyone other than Aviles-Rogel during the second meeting when the cocaine was delivered. I again searched the CHS and the CHS's vehicle for money and contraband finding none. The CHS handed PO Torres two clear plastic bags, each containing a white, hard brick-like chunk that I suspected was cocaine. PO Torres and I drove the suspected cocaine back to the FBI building for testing and to place the cocaine on evidence. TFO Larrel Lirette tested the suspected cocaine using the TruNark testing device. The suspected cocaine tested positive for Cocaine HCI with an approximate weight of 196.7 grams (with original packaging).

51. Evidence obtained during this investigation leads case agents to believe that Aviles-Rogel operates the **Target Cell Phone**. The location data associated with the **Target Cell Phone** will assist case agents in identifying Aviles-Rogel conducting targeted physical surveillance, and further identifying the locations and individuals associated with and the nature and scope of Aviles-Rogel's drug trafficking activities.

52.     I conducted a cell phone provider check and the service provider for the **Target Cell Phone** is T-Mobile.

53.     Case agents are requesting this warrant authorizing the initial collection of data related to the **Target Cell Phone** for 30 days to further investigate Aviles-Rogel's activities, and to identify locations to which Aviles0-Rogel is traveling to further his drug distribution trafficking activities.

54.     Based upon my training and experience, I know that individuals involved in drug trafficking use their cellular telephones to contact other drug dealers and drug purchasers, and that information relating to their telephones may show the areas in which they are trafficking drugs and the individuals who they are contacting to sell or distribute the drugs. Based upon the facts in this affidavit, there is probable cause to believe that Aviles-Rogel is engaged in the trafficking and distribution of controlled substances and is using the **Target Cell Phone** while engaged in these crimes.   I further submit that probable cause exists to believe that obtaining the location information of the **Target Cell Phone** will assist case agents in determining Aviles-Rogel's criminal activities, to include meeting locations, co-conspirators, and sources of supply.

**Prior Court Authorized Electronic Surveillance**

55.     On November 14, 2023, the Honorable Judge William E. Duffin authorized a warrant for electronic surveillance for 847-641-6044 (**Target Cell Phone**), which was served on T-Mobile.  On December 12, 2023, and January 12, 2024, the Honorable Judge William E. Duffin authorized extension of the warrant for electronic surveillance for 847-641-6044 (**Target Cell Phone**), which were also served on T-Mobile.  In early February 2024, the Honorable District Court Judge Brett Ludwig issued an order that, in part, allowed for the tracking of location data

24

associated with the Target Cell Phone. That order expires on March 5, 2024. As such, I am now seeking a new order for call and location data associated with the Target Cell Phone. My review of the previously obtained court authorized electronic surveillance data and call details records, in conjunction with physical surveillance, and other aspects of the ongoing investigation, are all consistent with the Aviles-Rogel's ongoing involvement with drug trafficking and the Botello DTO.

56.     Since case agents have been monitoring 847-641-6044 (**Target Cell Phone**) via the previously authorized court orders, case agents were able to: (1) confirm locations frequented by Aviles-Rogel including his residence and El Infierno; (2) more effectively coordinate physical surveillance efforts of his known locations; and (3) more effectively monitor his movements in coordination with operations, such as controlled buy #3 and #4. The location data associated with the **Target Cell Phone** will assist case agents in conducting targeted physical surveillance and further identifying the locations and individuals associated with this DTO and the nature and scope of Aviles-Rogel's drug trafficking activities. For example, case agents believe that it will be valuable to their investigation to have ongoing precision phone location information for Aviles-Rogel's phone (Target Cell Phone) because it will help case agents determine when Aviles-Rogel is likely present at El Infierno Bar along with other known Botello DTO members (case agents currently have court orders authorizing similar pings/ongoing precision phone location information on phones associated with Botello Sr., Botello Jr. and V. Botello), so that case agents can conduct physical surveillance and other investigative operations at that location.

57.     Evidence obtained during this investigation leads case agents to believe that Aviles-Rogel operates the **Target Cell Phone**. I conducted a cell phone provider check and the service

provider for the **Target Cell Phone** is T-Mobile.

58. Case agents are requesting this warrant authorizing a collection of data related to the **Target Cell Phone** for an additional 30 days to further investigate Aviles-Rogel's activities, and to identify locations to which Aviles-Rogel is traveling to further his drug distribution trafficking activities.

59. Based upon my training and experience, I know that individuals involved in drug trafficking use their cellular telephones to contact other drug dealers and drug purchasers, and that information relating to their telephones may show the areas in which they are trafficking drugs and the individuals who they are contacting to sell or distribute the drugs. Based upon the facts in this affidavit, there is probable cause to believe that Aviles-Rogel is engaged in the trafficking and distribution of controlled substances and is using the **Target Cell Phone** while engaged in these crimes. I further submit that probable cause exists to believe that obtaining the location information of the **Target Cell Phone** will assist case agents in determining Aviles-Rogel's criminal activities, to include meeting locations, co-conspirators, and sources of supply.

60. In my training and experience, I have learned that the Service Provider is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas,

26

and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

### Cell-Site Data

61. Based on my training and experience, I know that the Service Provider can collect cell-site data on a prospective basis about the Target Cell Phone. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; and (4) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

62. I further know that some service providers can collect timing advance or engineering data commonly referred to as, RTT, Timing Advance, LOCDBOR, or equivalent. This engineering data provides a distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate geographic area that is more precise than cell-site data alone.

### E-911 Phase II / GPS Location Data

63. I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the

27

cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available.

**Subscriber Information**

64.     Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes

28

under investigation because the information can be used to identify the Target Cell Phone's user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

65. Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

66. I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

67. I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

68. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 180 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give

29

that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. See 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. See 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. See 18 U.S.C. § 3103a(b)(2).

69. Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I therefore request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

<u>**ATTACHMENT A**</u>

**Property to be Searched**

1.  Records and information associated with the cellular device assigned call number 847-641-6044 (referred to herein and in Attachment B as the "**Target Cell Phone**"), with an unknown listed subscriber, and used by Roberto Aviles-Rogel, that is in the custody or control of T-Mobile (referred to herein and in Attachment B as the "Service Provider"), a wireless communications service provider that is headquartered at 4 Sylvan Way, Parsippany NJ, 07054.

2.  The Target Cell Phone.

31

## ATTACHMENT B

## Particular Things to Be Seized

Pursuant to an investigation of Roberto Aviles-Rogel (a.k.a. "Negro") for violations of 21 U.S.C. § 841(a)(1) (distribution and possession with the intent to distribute controlled substances), 846 (conspiracy to distribute and possess with the intent to distribute controlled substances), and 843(b) (illegal use of a communication facility), this Warrant authorizes the officers to whom it is directed to determine the location of the **Target Cell Phone** by collecting and examining the following:

## I.     Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a.     The following subscriber and historical information about the customers or subscribers associated with the Target Cell Phone for the time period of February 1, 2024, to the present:

i.   Names (including subscriber names, usernames, and screen names);

ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

iii. Local and long-distance telephone connection records;

iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

32

v.   Length of service (including start date) and types of service utilized;

vi.   Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii.   Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii.   Means and source of payment for such service (including any credit card or bank account number) and billing records, and

ix.   All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phone for the time period February 1, 2024, to the present including:

a.   the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

b.   information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT, Timing Advance, LOCDBOR, or equivalent).

b.   Information associated with each communication to and from the Target Cell Phone for a period of 30 days from the date of this warrant, including:

i.   Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii.   Source and destination telephone numbers;

iii.   Date, time, and duration of communication; and

iv.   All data about the cell towers (i.e., antenna towers covering specific geographic areas) and sectors (i.e., faces of the towers) to which the Target Cell Phone will connect at the beginning and end of each communication,

33

as well as timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT, Timing Advance, LOCDBOR, or equivalent).

c. Information about the location of the Target Cell Phone for a period of 30 days during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

    i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

    ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. See 18 U.S.C. § 3103a(b)(2).

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 21 U.S.C. § 841(a)(1) (distribution and possession with the intent to distribute controlled substances), 846 (conspiracy to distribute and possess with the intent to distribute controlled substances), and 843(b) (illegal use of a communication facility), involving Roberto Aviles-Rogel (a.k.a. "Negro") and others known and unknown.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are

34

authorized to review the records produced by the Provider in order to locate the things particularly

described in this Warrant.

**CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)**

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by T-Mobile, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of T-Mobile. The attached records consist of _____.

I further state that:

a.      All records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of T-Mobile and they were made T-Mobile as a regular practice; and

b.      Such records were generated by T-Mobile's electronic process or system that produces an accurate result, to wit:

1.      The records were copied from electronic device(s), storage medium(s), or file(s) in the custody of T-Mobile in a manner to ensure that they are true duplicates of the original records; and

2.      The process or system is regularly verified by T-Mobile and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____        _____
               Date                                             Signature